## Tyrone Gas & Water Company *v.* Borough of Tyrone.

*Corporations—Water companies—Exclusive privileges—Boroughs—Acts of April 3, 1851, March 10, 1865, April 29, 1874, and June 2, 1887.*

Where a water company incorporated by the special act of March 10, 1865, accepted on September 1, 1893, the provisions of the entire constitution of 1874, and the provisions of the act of April 29, 1874, it thereby lost its exclusive franchise granted in its charter, but it gained in lieu thereof the exclusive privilege given to water companies by clause 3, section 34 of the Act of April 29, 1874, but at the same time it rendered itself amenable to clause 7 of the same section which provides a method whereby municipalities may purchase the plants of water companies. Where such a company has a contract express or implied with a borough to furnish water for fire protection, the borough has no power after the company has accepted the constitution and act of 1874, to erect a waterworks of its own.

The fact that the water company accepted the provisions of the constitution and of the act of April 29, 1874, after the passage of the act of June 2, 1887, abrogating the special privileges of water companies, does not deprive the company of the exclusive privileges of the act of 1874. The legislative intent in the passage of the acceptance section of the act of 1874 was to put all old corporations accepting the constitution on a par with corporations chartered immediately after its passage, say on April 30, 1874.

Argued April, 18, 1900. Appeal, No. 82, Jan. T., 1900, by defendants, from decree of C. P. Blair Co., Equity Docket " B," No. 322, on bill in equity, in case of Tyrone Gas & Water Company v. Borough of Tyrone et al., Councilmen. Before GREEN, C. J., McCOLLUM, DEAN, BROWN and MESTREZAT, JJ. Affirmed.

Bill in equity for an injunction.

The facts appear by the opinion of BELL, P. J., which was as follows:

### FINDINGS OF FACT.

The plaintiff water company was chartered by act of assembly of March 10, 1865, P. L. appendix 1866, page 1147. Said act gave said company " the exclusive right to provide, erect and maintain all works and machinery necessary, or

proper, for making and introducing into the borough of Tyrone a sufficient supply of gas, and raising and introducing a sufficient supply of good and wholesome water from the Sinking Run, or some other convenient source."

The defendant borough was incorporated July 27, 1857, under the Act of April 3, 1851, P. L. 1851, page 320, entitled "An act regulating boroughs," and generally known as the general borough act. Up to, and prior to 1869, or 1870, said borough had taken no steps to supply itself and its citizens with water. About January 1, 1870, the plaintiff water company did introduce water into said borough by laying pipes through the street. Formal consent so to do was not asked from, or given by, said borough, but said borough proceeded to avail itself of the water so introduced for fire protection, and caused fire plugs to be attached to said water pipes, the said water company providing "tees" for same at such points as the borough authorities indicated. The borough seems to have paid the water company the yearly rate of $2.00 for each of said plugs from the start. Just how such rate was fixed at the outset, does not appear, but the minutes of a meeting of the borough councils, held July 25, 1875, show the following: Motion of Mr. Conrad that $2.00 per annum for each fire plug to be paid the gas and water company for use of water was agreed to.

As the inhabitants of the borough increased, and as said borough widened its borders, the water company increased its facilities to accommodate the increase in population and territory, by enlarging its pipes and extending same into new streets. The minutes of the borough council show that such extensions were requested in several instances, and on one occasion (May 6, 1889), when the water company had refused to extend after "repeated efforts," the light and water committee was instructed to confer with the solicitor to learn what could be done in the matter. Councils seemed to have been moved to so act because "the people in that section of the town" claimed that they did "not have proper fire protection," and threatened to "refuse to pay light and water tax if this protection is not given." As said borough increased in population and territory, said water company likewise placed additional "tees" in their water pipes, for additional fire plugs, at points indicated by the borough authorities.

The Act of April 16, 1875, P. L. 1875, page 55, authorized boroughs, after first submitting the question to a popular vote, to levy and collect an annual tax to be exclusively expended "for the purpose of purchasing, erecting and maintaining such fire plugs and hydrants, . . . . as may be required to supply the said boroughs with a sufficient supply of water for the extinguishment of fires, cleansing the streets, and other public purposes, . . . . and defraying the expenses in making all necessary attachments to gas and water mains." The language of the act, as well as the proviso at its end, shows that it was only to apply to boroughs which were to be supplied by water companies.

The borough of Tyrone availed itself of this act and annually thereafter, until 1899, levied and collected a "gas and water tax." A portion of the money so raised was paid to the plaintiff water company for water for fire protection and other public purposes. All of the tax expended for water was so applied.

In the latter part of 1895 or 1896, said water company expended a large sum of money in enlarging its plant. A large new reservoir higher up Sinking run was built and enlarged mains laid therefrom.

On September 1, 1893, said water company duly accepted the provisions of the constitution of this commonwealth and the provisions of an act, entitled "An act to provide for the incorporation and regulation of certain corporations," approved April 29, 1874, and the supplements thereto. In 1896 the capital stock of the water company was increased from $20,000 to $100,000, and the indebtedness was increased from $25,000 to $60,000. It is probable, although there is no affirmative evidence, that a part of such increase was necessitated by the expensive improvements mentioned in the preceding paragraph.

After said improvements were made, the supply of water was reasonably ample for the needs of Tyrone. During the greater part of the year it was ample and it was only in times of drouth that the company had to enforce any regulations against the wasteful use of water.

In January, 1899, the plaintiff water company sought to raise the rate to be paid by the borough for fire protection. The borough councils deemed the advanced rate to be exorbitant.

This controversy about such rate resulted in the water company turning the water off of some six fire plugs in the business portion of Tyrone. The borough councils turned on the water in said plugs and placed a policeman over them to prevent the water company from interfering with them. I attach but little importance to this controversy as affecting the legal question now for decision. If it be urged on the part of defendants that such action indicated a purpose on the part of the water company to sever any contract relation which existed with the borough, it can be likewise urged, with equal force, on behalf of plaintiffs, that the occurrence demonstrated the fact that the water company had been giving the borough fire protection, and that the borough was dependent on the water company for such fire protection. If the rate, proposed to be charged, was exorbitant, the borough could have invoked the aid of this court to determine what was a reasonable rate, under the provisions of clause 7, section 34 of the Act of April 29, 1874, P. L. 1874, page 93, which provides " that the charges shall be decreased as to the court may seem just and equitable," in cases of disputes as to " charges " by water companies for " water so furnished."

Shortly after said dispute had thus culminated in the water company attempting to turn off water from fire plugs, and the borough keeping it on by the display of force, the borough councils, by the passage of the ordinances referred to in plaintiffs' bill, undertook to supply itself and its citizens with water from a new plant to be erected and owned by the municipality. Plaintiffs then brought this action to restrain the municipality from so doing. These are all the facts deemed necessary to be found in order to arrive at a just decision of the legal questions involved. Some of these facts are likewise found, perhaps in some instances more specifically and in detail, in the answers to plaintiffs' and defendants' requests for findings of facts, which said requests and our findings, are herewith filed and made a part of this opinion.

### LEGAL DISCUSSION.

Counsel for the defendants cite, and rely on, Lehigh Water Company's Appeal, 102 Pa. 515. If the dicta of Mr. Justice PAXSON in that case were now the legal doctrine governing similar cases, judgment most probably would have to be entered

for defendants. Judge PAXSON, in that case (102 Pa. 528), said:

" The third ground of objection is wholly without merit. By constructing waterworks of its own the borough will not destroy the franchises of the plaintiff company. It may impair their value, and probably will do so, but of this the company have no legal cause of complaint. The granting of a new charter to a new corporation may sometimes render valueless the franchises of an existing corporation ; but unless the state, by contract, has precluded itself from such new grant, the incidental injury can constitute no obstacle."

But in White v. City of Meadville, 177 Pa. 643, the Supreme Court, in effect, decide that the above cited remarks of Judge PAXSON are mere dicta, and confine the authority of said case of Lehigh Water Company's Appeal to the questions therein specifically decided.

That the trend of judicial decision is now turned in a somewhat different direction, from the course mapped out in said case of Lehigh Water Company's Appeal, can readily be seen by comparing the remarks of Mr. Justice DEAN in White v. City of Meadville, supra, with the hereinbefore recited utterances of Judge PAXSON.

Judge DEAN shows that municipalities have no inherent right to erect waterworks. That by legislation they are authorized to procure water for public purposes in two methods, either by erecting their own plant, or by contracting with a water company. When they have adopted the one method they have provisionally exhausted their power, and can only conditionally resort to the other method. As to the mischief and injustice which would result from a contrary ruling he says (177 Pa. 651) :

" Here then, plainly, were two distinct methods by which the municipality could supply its citizens with water; by putting either method in operation, the same end was accomplished, that is the supplying of the citizens with water ; there is no repugnancy in the provisions of the two acts, on the assumption that one, or the other alone will be adopted to effect the purpose ; there will be a decided repugnancy in their operation, if both be put to work at the same time to effect that purpose. If anything be manifest, it is, that if two

water mains be laid side by side in the same street, equally accessible to the householder on each side, conveying double the quantity needed, with double sets of hydrants, pumping stations, offices, salaries and expenses, one or the other must be abandoned.   No community will pay double for any article of necessity or luxury.   If the property owner must, by compulsory taxation, support the municipal system, he will not voluntarily support the private corporation system; such a conflict of interests will inevitably bankrupt the system which depends on the voluntary patronage of the public.   We hesitate to assume, every court is bound to hesitate long before assuming, the legislature intends, by grants to distinct corporations for public purposes, there shall arise such conflict in the exercise of the franchises as will result in the practical destruction of property of any citizen without compensation."

Again (177 Pa. 653):

" A municipality, in its beginnings, is perhaps not financially strong, or its debt may approach the constitutional limit so closely that it cannot borrow; nevertheless, the low state of its financial condition does not render less urgent the necessity of a water supply; it can obtain it in but one way, by contract with those who have the money and are willing to invest their private capital in the construction of waterworks; the legislature knew capital would not be invested in such an enterprise if in the future it were liable to confiscation by competition with a public enterprise operated from a municipal treasury, capable of replenishment from the pocket of the taxpayer. That fact suggested clause 7 of the corporation act; the municipality will not be forever poor; the time will come when it will be of financial ability to own and operate its own works; the very fact of having a supply of water on an investment of private capital has tended to stimulate its growth, and to largely appreciate the value of taxable property."

Judge DEAN then proceeds to point out that the municipality can purchase the plant of the water company by paying a reasonable price therefor; that the right to so purchase is provided for by the legislature, and the method of determining what is a reasonable price is within the supervision of the court.   After distinguishing the case of Lehigh Water Company's Appeal, supra, he virtually overrules the kindred case of Howard's Ap-

peal, Millvale Borough, 162 Pa. 374. As to said last mentioned case he says :

"It was a mistake. We are now glad of the opportunity of correction, especially so, because the example of Millvale borough seems to have misled other municipal corporations to adopt the same course of action. Luzerne Water Company v. Toby Creek Water Company, 148 Pa. 568, also cited by defendants was a controversy between two rival companies, and the power of the municipality did not come in question."

The case of Centre Hall Water Co. v. Centre Hall Borough, 186 Pa. 74, cited by counsel for defendants, is not in conflict with White v. City of Meadville, from which the foregoing quotations were made, but is clearly distinguishable. In the Centre Hall case, the water company never had any exclusive privileges, but sought to obtain same by accepting the new constitution after the borough began work on a municipal plant. At no time during the incorporation of the borough was any fire protection afforded and the water companies' pipes were too small to afford adequate protection, even had fire plugs been attached. There was no pretense of a contract express or implied. Metzger v. The Borough of Beaver Falls, 178 Pa. 1, and Wilson v. Rochester Borough, 180 Pa. 509, are kindred cases to White v. City of Meadville, supra.

Of all the cases cited by counsel, Gas & Water Company v. Borough of Downingtown, 175 Pa. 341, in its facts is the nearest akin to the present case. In that case, as in this one, the respective borough was chartered under the general borough law ; the respective water company had an exclusive franchise. The Downingtown Water Company accepted the provision of article 16 of the constitution ; the Tyrone Water Company accepted the provisions of the constitution and also of the corporation act of 1874. The borough of Downingtown, claiming that by so doing the water company had lost its exclusive franchise, undertook to build a municipal water plant. The Supreme Court restrained the borough from so doing, Mr. Justice FELL in his opinion, saying :

"At the time of the passage of the act" (the act incorporating the water company) "the borough had failed to exercise the power conferred upon it to establish waterworks. The borough was a mere agency of the state for governmental purposes;

its charter was not a contract within the protection of the prohibition against laws impairing the obligation of contracts, and it had no vested rights to its powers and franchises. The agency was revocable: City of Erie v. Erie Canal Co., 59 Pa. 174; Philadelphia v. Fox, 64 Pa. 169. The legislature had the power to take away the right of the borough to construct waterworks and confer it upon another. Its power over the subject-matter was absolute, and it exercised it by creating a corporation and conferring upon it the power which it had previously conferred upon the borough. It thus created a new agency and conferred upon it privileges which were in terms exclusive of all other agencies. The water company accepted the grant of power which the borough had failed to execute, together with its privileges, and made expenditures and completed its works. The exclusive privilege was the inducement for the expenditure of money in the construction and operation of the works. The purpose was to protect the company and to secure it the exclusive enjoyment of its franchises, not for all time and against all parties, for the borough could at any time elect, under legislation, to which the charter was expressly made subject, to purchase the works. . . . The grant of an exclusive privilege to the water company is expressed in words that are clear and unequivocal. If we look beyond the words of the act, it is manifest that the object in making the privilege exclusive was to induce the expenditure of capital for the needed work by securing the company from the ruinous effect of competition. It could not have been expected to do this by excluding private competition, which there is little reason to anticipate, and leaving it exposed to the only competition which it had reason to fear, that of the borough."

Counsel for defendants sought to distinguish said Downingtown Borough case from the present, inasmuch as the Downingtown Water Company only accepted article 16 of the constitution, whereas the Tyrone Water Company accepted the entire constitution, as well as the provisions of the corporation act of April 29, 1874, and its supplements. This, say counsel, put the Tyrone Water Company on the same footing with water companies chartered after the adoption of the constitution. Clause 3, section 34, of said Act of April 29, 1874, P. L. 1874, p. 94, did give gas and water companies an ex-

clusive privilege, subject, however, to the right of the municipality to purchase, but it is argued that such exclusive franchise, so far as regards water companies, was abrogated by the Act of June 2, 1887, P. L. 1887, p. 312, which act is a supplement to said corporation act of April 29, 1874. Hence, say counsel, there ceased to be any legislation giving water companies thereafter any exclusive franchises. When, in 1893, the Tyrone Water Company accepted the provisions of the constitution and the said legislation, it was put on the same footing as if it had been chartered in 1893, and lost its exclusive franchises. Luzerne Water Company v. Toby Creek Water Company, 148 Pa. 569, is cited in support of this legal proposition. In this case, the opinion of Judge RICE (then president judge of Luzerne county) was affirmed by the Supreme Court in a per curiam opinion. With all due deference to Judge RICE, I respectfully submit that his said opinion lacks the convincing force with which he usually clinches his judicial reasoning. The title to said act of June 2, 1887, to my mind is misleading. But waiving this question, and, assuming that said case is authority on the precise question it does decide, it must be remembered that Mr. Justice DEAN, in White v. The City of Meadville, supra, intimates that the doctrine of said case of Luzerne Water Company v. Toby Creek Water Company, is to be confined to private corporations, not municipalities. Moreover, there was no question of equities in said case; both corporations were chartered after the passage of the act of 1887 (opinion of Judge RICE, 148 Pa. 570); neither had any superior equity; the corporators of each knew when they invested their money, or ought to have known, that such investment was not made on the faith of an exclusive privilege.

But it seems to me a different question arises in the case of a corporation, chartered prior to said act of April 29, 1874, and accepting the provisions of the constitution after the enactment of said act of June 2, 1887.

Section 26, Act of April 29, 1874, Purd. Dig. 413, sec. 38, provides as follows: "Any corporation or corporations for any of the purposes named and covered by the provisions of this act, heretofore created by any special act, or acts, or in existence under the provisions of any general law of this commonwealth, shall be entitled to all the privileges, immunities,

franchises and powers conferred by this act upon corporations to be created under the same, upon filing in the office of the secretary of the commonwealth, a certificate . . . . accepting the provisions of the constitution and of the act. . . .

The argument of counsel for plaintiffs, that said act, just recited, required no surrender of privileges, therefore no privileges were lost, does not strike me as being of sufficient force to sustain their contention. Inferentially, at least, there was to be a surrender of old privileges, as a consideration for the obtaining of the new. The reasoning of Judge REEDER in Wallace v. Lehigh Water Co., 1 Northampton County Reports, 117, on this point, seems to be satisfactory. One object of said act doubtless was to obtain uniformity, as respects corporations of the same class; all old corporations were to be as if chartered immediately after the passage of said act of April 29, 1874; this would put all corporations in existence at that time, on an equal footing. But, to go a step further, as counsel for defendants seek to do, and hold that after the passage of the amendment of June 2, 1887, corporations chartered prior to April 29, 1874, could only accept the new constitution at the expense of the surrender of their exclusive privileges in toto, would tend not to uniformity, but to diversity in two ways; first, such old corporations would not, knowing this fact, accept the constitution; second, if they did there would be an incongruity in the rights of corporations which existed prior to the passage of said amendment of June 2, 1887; and the older corporations would be at a disadvantage, as compared with those chartered between April 29, 1874, and June 2, 1887. The water companies chartered between said two dates had an exclusive franchise (Act of April 29, 1874, P. L. 1874, sec. 34, p. 93; Purd. Dig. p. 955, sec. 4) subject to the right of the municipality to purchase (Purd. Dig. p. 955, sec. 8); said corporations certainly were under the protection of the proviso in section 10, article 16, of the constitution, requiring that "no injustice shall be done to the corporation" by legislation altering, or annulling charters. But to adopt the contention of defendant's counsel is to deny to the Tyrone Water Company, chartered in 1867, and going into business in 1870, a privilege, namely, said constitutional protection, which a water company chartered on April 30, 1874, enjoys. This would not be uniformity, but diversity, and the junior company would have the advantage of the senior.

It might be allowable to go a step further and treat said amendment of June 2, 1887, as unconstitutional, as respects all water companies in existence prior to its passage ; first because said amendment as to such old companies amounted to confiscation without compensation and violated the spirit of the decision of the United States Supreme Court in Dartmouth College v. Woodward, 4 Wheaton, 712 ; second, because all of said old companies are within the protection of the Pennsylvania constitutional provision requiring that " no injustice shall be done to the corporators." But I prefer to put my ruling on the (to my mind) safer, surer, and more conservative ground that the legislative intent, in the passage of said acceptance section of the act of April 29, 1874, was to put all old corporations accepting the constitution on a par with corporations chartered immediately after its passage, say on April 30, 1874. This construction tends to carry out the legislative purpose—namely, uniformity as to the rights, privileges, and obligations of corporations of the same class—as of the same date of charter, and protects the rights of the corporation, while it renders it amenable to the corporation act of April 29, 1874.

In this connection, it will be observed that the new charter, issued by the governor to the water company, made no mention of the water company being subject to any supplements ; it only, by its terms, mentions the act of April 29, 1874, without specifying that the corporation is subject to said act and its supplements. This indicates that the commonwealth, speaking through its governor, attached but little importance to said supplements.

Most certainly the Tyrone Water Company when it accepted the provisions of the constitution of this commonwealth, and the provision of an act entitled " An act to provide for the incorporation and regulation of certain corporations," approved April 29, A. D., 1874, and the supplements thereto, did not mean to give away its birthright for a mess of potage. It thereby subjected itself to the general legislation governing water companies ; it thereby rendered itself amenable to legislative control ; it thereby, in effect, said its chartered rights should be no greater than those of a water company chartered on April 30, 1874. But did it intend that its said chartered rights should be less than those of said last named company ? It accepted

the constitution in the same sentence by which it rendered itself amenable to legislation, and did not such acceptance bring it within the protection of the consitution which prohibits virtual confiscation without compensation ? Pennsylvania Railroad Company v. Duncan, 111 Pa. 353 and Pennsylvania Railroad Company v. Miller, 132 U. S. 75 (the Filbert Street cases) do not conflict with this conclusion just indicated. The decision of said cases turned rather on the right of the legislature to alter a remedy; that such alteration is not unconstitutional is held in numerous cases.

### LEGAL CONCLUSIONS.

When the Tyrone Water Company, plaintiff, on September 1, 1893, accepted the provision of the constitution and of the act of April 29, 1874, and its supplement, it put itself on a par with like water companies chartered immediately subsequent to the passage of said act. It lost its exclusive franchise granted it by its charter, but it gained, in lieu thereof, the exclusive privilege given to water companies by clause 3, section 34, of said Act of April 29, 1874, P. L. 1874, p. 94. But, at the same time it rendered itself amenable to clause 7, of the same section of the same act, which provides a method whereby municipalities can purchase the plants of water companies. Said acceptance of the constitution, moreover, brought said Tyrone Water Company within both the scope and the protection of section 10, article 16 of the constitution which is as follows :

" The general assembly shall have the power to alter, revoke, or annul any charter, of incorporation now existing, and revocable at the adoption of this constitution, or any that may hereafter be created, whenever in their opinion, it may be injurious to the citizens of this commonwealth, in such manner, however, that no injustice shall be done to the corporators."

This conclusion works no injustice to either the water company or the borough. When the water company was incorporated, it took the charter subject to the provisions of the constitutional amendment of 1857, which reads as follows :

"The legislature shall have the power to alter, revoke or annul any charter, of incorporation hereafter conferred by, or under any special, or general law, whenever in their opinion it

may be injurious to the citizens of the commonwealth; in such manner, however, that no injustice shall be done the corporators."

The water company then ought not to be heard to complain of the legislation of 1874 (hereinbefore referred to), allowing the borough to purchase, since, from its very inception, it was subject to such legislation. On the other hand, the borough has no true ground for fault finding, since, by the fundamental law of the land, the constitution itself, the confiscation of franchises without compensation to the corporators, is prohibited. And the remarks of Judge DEAN, in White v. City of Meadville, 177 Pa. 643, and Judge FELL in Downingtown Gas & Water Company v. The Borough of Downingtown, 175 Pa. 341 (hereinbefore cited) are convincing to the effect that the construction of a municipal water plant, in competition to a water company's plant already occupying the same ground, and supplying the same needs, is a virtual confiscation, without compensation, of the property of the latter company. The borough of Tyrone, therefore, has no right to construct a municipal water plant; if said borough desires to own its own waterworks, it must buy out the water company, in accordance with the provisions of said hereinbefore recited clause 7, section 34, act of April 29, 1874, P. L. 1874, p. 95.

The same legal conclusion is arrived at by following out the legal reasoning of Mr. Justice DEAN in White v. Meadville, supra, and in Carlisle Gas, etc., Company v. Carlisle Water Company, 188 Pa. 51, and of Mr. Justice FELL in the Downingtown Water Company case, supra. In all of said cases it is held that boroughs have no inherent vested rights to construct waterworks; their power so to do depends on legislation. In said Carlisle Water Company case, Mr. Justice DEAN, after referring to White v. Meadville, and kindred cases, sums up the matter thus:

" In all these cases we held that by the present legislation on the subject, a municipality was authorized to adopt one of two methods to supply itself with water. 1. It could construct and operate its own works by municipal taxation; or, 2. It could contract with a private corporation to construct works and to supply the municipality with water."

" We further held that it could not adopt both methods and

have them in operation at the same time ; the selection of one was necessarily, under the law, a final rejection of the other as long as the first continued the supply according to law."

The facts in this case show that the borough of Tyrone adopted the method of obtaining a supply from the plaintiffs' water company ; this precludes them from the other method, construction of municipal works, except provisionally by purchasing the water company's plant.    True, there was no express contract as in the case of White v. Meadville, supra, but there was an implied contract, and the Downingtown water case, supra, is persuasive, at least, that an implied contract is as binding as an express one.    The Tyrone Water Company supplied fire protection to the borough, when the credit of that municipality was so low that it could only market its bonds at ninety cents on the dollar to provide the wherewithal to purchase fire plugs. Then as the borough increased in population and territory, the water company likewise increased its plant to supply the increased needs, and extended its pipes to give additional fire protection.    True, plaintiffs can only show two or three specific requests by the borough authorities for such increase of plant, or extension of pipes.    But, the action of the borough in levying a water tax under the provisions of the Act of April 16, 1875, P. L. 1875, p. 55, is persuasive, at least of such contract, and also that the borough had adopted the method of supplying itself with water through the medium of a water company.    And did not the acceptance of such facilities, extended and made possible, by the water company, amount to an implied contract?    Would it not be inequitable to allow the borough, in its comparative strength, to repudiate the implied contract?    Would it not now be especially and peculiarly inequitable to allow the borough now to so repudiate the water company since said company, as late as 1896, with the knowledge of the borough and without any protest or warning from the municipal authorities, expended large sums of money in enlarging its plant, so as to meet the wants of the growing town of Tyrone?    And the borough is not prejudiced by making it pay a reasonable price for the water company's plant.    It would have to expend large sums of money to duplicate said works, and then the result would be that, by building a municipal plant, the value of the private plant would be destroyed ; it would be useless destruction of property with-

out adequate compensation from any standpoint you view the transaction. It is no answer to aver that the water company asks an unreasonable price for its plant. Under the legislation hereinbefore cited, the matter of a reasonable price is within the control of the court, and such court would endeavor to see that no injustice was done to the borough in case of a purchase, just as an effort is now made to prevent the borough disregarding the just rights of the water company.

There is no allegation, much less proof, that the water company failed to provide a reasonable adequate supply of water, both for fire protection and to supply the citizens. The only allegation is that, when the water company and the borough authorities disagreed as to the yearly rate for fire protection, the water company turned off the water from some six fire plugs. Grant that this was a wrongful act on the part of the water company, the borough authorities, under the proviso to clause 3 section 34, Act of April 29, 1874, P. L. 1874, 94, had ample means of redress through the courts. The water company had no desire to cease furnishing the borough with water; it was only an effort on its part to show that it " meant business," to use a slang term. The borough authorities, in turn, by their actions indicated a purpose on their part neither to pay the advanced rate, nor to dispense with the much needed water supply.

And the very fact that the borough authorities forcibly turned on the water again and kept it on by show of force, to my mind, demonstrates, beyond question, that the borough was dependent on the water company for fire protection, and had been so for years. When the water company undertook to use the plant, as if it were private property, the borough authorities said, in effect, " No, you cannot do that; the public needs fire protection, and such fire protection it must have from your plant; your works are public property, and we will not permit you to do with them as you please." Does not this indicate, at least, an implied contract on the part of the borough of Tyrone to accept its water supply from the plaintiff water company?

### DECREE.

On December 28, 1899, this cause came on for final hearing, testimony was taken and the matter was argued by counsel.

And now, January 24, 1900, after due consideration, the injunction heretofore granted is hereby made perpetual, the borough of Tyrone, defendant, to pay the costs.

Same day exception noted for defendants.

*Error assigned* was the decree making injunction perpetual.

*W. L. Hicks,* of *Hicks & Templeton* and *A. O. Furst,* for appellants.—The Act of June 2, 1887, P. L. 310, section 3, repealed the exclusive privilege conferred upon water companies by the act of 1874: Luzerne Water Co. v. Toby Creek Water Co., 148 Pa. 568; Philipsburg Water Co. v. Citizens' Water Co., 189 Pa. 23.

The Tyrone Water Company, having become by its acts a corporation, under the new constitution became amenable to and subject to the provisions of the act of June 2, 1887, which took away its exclusive franchise as a water company: Freeport Water Works Co. v. Prager, 129 Pa. 605.

The exclusive privilege of supplying water to the public within their respective territories conferred upon water companies by the act of April 29, 1874, exists only as against other incorporated water companies, and not as against municipal corporations or individuals: Lehigh Water Co.'s App., 102 Pa. 515; Harlow v. Beaver Falls Borough, 188 Pa. 265.

The case of Lehigh Water Co.'s Appeal was again considered in White v. City of Meadville, 177 Pa. 643, and it was there distinguished but not overruled. It certainly remains, so far as any decision of the Supreme Court is known to us, as the law applicable to the facts of that case, and peculiarly applicable to the facts under consideration.

The borough never having made any contract with the water company, and never having by any corporate action, induced the water company to extend its pipes or expend money, upon the faith of such corporate act, the borough had the right to establish its own municipal plant: Centre Hall Water Co. v. Centre Hall Borough, 186 Pa. 74; White v. Meadville, 177 Pa. 643.

*Stevens, Owens & Pascoe,* for appellee were not heard, but cited on the question of contract, Bank of Columbia v. Patterson,

7 Cranch, 299, Metzger v. Borough of Beaver Falls, 178 Pa. 1, and White v. City of Meadville, 177 Pa. 643.

On the question of exclusive franchises: Gas & Water Co. v. Downingtown, 193 Pa. 263; Williamsport Gas Co. v. Gas Co. of Williamsport, 5 Dist. Rep. 251; Metzger v. Beaver Falls, 178 Pa. 1.

PER CURIAM, April 30, 1900:

The opinion of the learned court below is so full and exhaustive as to all the points of contention, and is so entirely correct and in accordance with our recent decisions in this class of cases, that we feel we can add nothing to it, and we therefore adopt it as the opinion of this court and affirm the decree upon the reasons and considerations therein expressed.

Decree affirmed and appeal dismissed at the cost of the appellants.