# Shaffer, Appellant, *v.* The Public Service Commission.

*Public Service Commission—Telephone companies—Merger—Act of July 22, 1919, P. L. 1123.*

A corporation organized as a telegraph company at a time when there was no provision for the incorporation of telephone companies, but engaged only in telephone service is subject to the constitutional prohibition against the merger or purchase of competing telegraph companies; the legislature may, however, provide for the organization of telephone companies and permit their merger, etc., subject to the approval of the Public Service Commission, if it determines that there is a substantial and fundamental difference between telegraph and telephone companies. And the legislature may provide for such a corporation organized as a telegraph company but giving only telephone service accepting the provisions of such act and becoming exclusively a telephone company.

The Act of July 22, 1919, P. L. 1123, supplemented the General Corporation Act so as to authorize the formation and creation of telephone companies and provided therein for the acceptance of its provisions by corporations theretofore incorporated under the laws of the Commonwealth engaged in the business of furnishing telephone service. By its terms authority is given to competing telephone companies created under said act, or having accepted its provisions, to merge and consolidate subject to the approval of the Public Service Commission.

An order of the Public Service Commission permitting competing telegraph companies engaged only in telephone service, which had accepted the provisions of the Act of July 22, 1919, P. L. 1123, relative to the incorporation of telephone companies, to merge will be affirmed where it appears that such merger will be for the benefit and interest of the public.

Where the commission has found that the merger of the applicant companies is necessary to their continued existence and will result in a greatly improved service, inuring to the accommodation and convenience of the public, the order of the commission will be affirmed.

Argued May 5, 1920. Appeal, No. 12, April T., 1920, by William Shaffer, Intervener, from the order of the Public Service Commission of the Commonwealth of

Pennsylvania, Application Docket, No. 3355, 1920, in the case of William Shaffer, Intervener, v. The Cochranton Telephone Company and the Merchants and Farmers Telephone Company, Petitioners, and The Public Service Commission of Pennsylvania, on appeal. Before PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Affirmed.

Petition for permission to merge and consolidate the Cochranton Telephone Company and the Merchants and Farmers Telephone Company.

The merger was approved by the Public Service Commission in the following opinion by Reed, Commissioner:

A similar application for the consolidation and merger of these two competing telephone companies was presented to this commission in 1916, and was refused as violative of the law as it existed at that time. In the absence of statutory authority for the creation of telephone companies by that name the courts had classed them as telegraph companies and clothed them with the rights and powers of such companies. While they only existed under and by virtue of the laws applicable to telegraph companies, it followed that they were subject to the same constitutional inhibition which prohibited the consolidation with, or holding a controlling interest in the stock or bonds of any other telegraph company owning a competing line: Cochranton Telephone Company v. The Public Service Commission, 70 Pa. Superior Ct. 212, affirmed in 263 Pa. 506. Unless these companies have since been given a distinct statutory status which relieves them from the infirmity inherited as telegraph companies under section 12, article XVI, of our Constitution, the present application, however meritorious, must be refused.

The question of the propriety and desirability of these companies merging was answered in the affirmative by this commission on their application filed at No. 516, 1916. It was there determined "that the merger and

consolidation of these competing companies would be for the service, safety, accommodation and convenience of the public, if it were not contrary to law." The facts which then moved the commission to so find still obtain and in a more intensified form by the lapse of the intervening time. Therefore we need not extend this report by a recital of facts heretofore existing and which continue to exist, urgently demanding that the present application be granted if these companies are to survive and the service, accommodation and convenience which by their consolidation will be secured, otherwise lost, to the public. The evidence clearly and conclusively establishes, and we so find as a fact, that the merger of these companies is necessary to their continued existence, and will result in a greatly improved service, inuring to the accommodation and convenience of the public.

This leaves for consideration the question of whether such merger can be legally effected. Since the Supreme and Superior Courts passed on this question in the case hereinbefore cited, the legislature by the Act of July 22, 1919, P. L. 1123, has provided for the incorporation and regulation of telephone companies; defining the rights, powers and privileges of such corporations, and authorizing and regulating the purchase, acquisition and leasing the whole or any part of the properties, systems, capital stock and securities of other corporations, associations and persons engaged in the telephone business; and also authorizing any corporation theretofore incorporated under the laws of this Commonwealth and engaged in the business of furnishing telephone service to accept the provisions of the act and thereupon acquire and possess all the privileges, immunities, rights, franchises and powers conferred upon corporations formed thereunder. The applicant companies with the approval of this commission, evidenced by its certificates of public convenience, have accepted the provisions of the Act of July 22, 1919, and thereby are given the legal status pro-

vided by that act. If this act is a valid piece of legislation then the right of these companies to consolidate and merge is no longer open to question. This suggests an inquiry as to the power of the legislature to differentiate between telegraph and telephone companies and by the process of classification take competing telephone companies out of that section of the Constitution which prohibits competing telegraph companies from consolidating or merging. Classification primarily is a question for the legislature, and only becomes a judicial question for determining, in any given situation, whether the legislative action is clearly unreasonable. If there is a reasonable and practical ground for the classification the courts generally have voiced their approval, and the courts of this State have only exercised their judicial power in annulling legislative enactments which clearly attempted special legislation under the guise of classification, or which were so clearly violative of some constitutional inhibition as to leave no well founded doubt of their offending character. We need not pause to cite the adjudicated cases in support of these general principles applicable to the present proceeding, but will pass to a consideration of what is shown by the evidence to be a fundamental distinction between the physical character, operation and service furnished by a telegraph company and by a telephone company. That telegraph and telephone companies have some operating factors in common must be conceded. They are electrically operated over wires strung on poles, and they have the common purpose of distant communication between persons, corporations and associations. Because of these characteristics in common and in the absence of any legislative recognition of telephone companies eo nomine the courts were constrained to liken them to telegraph companies and to clothe them with the powers and limitations of corporations of that class.

That the equipment and operation of the two systems and the service furnished by them respectively are radi-

cally different must be conceded. In telegraphy electrical impulses of long or short duration are sent over the wire and graphically or audibly received at the distant end by a responsive electrical mechanism. In general use it requires a trained operator to make and to interpret the "clicks" of the telegraphic instrument into letters and words. Only low frequency electrical currents can be sent or received, and not more than five or six interruptions per second can be thus passed over the wire. In telephony two hundred to two thousand vibrations or electric current oscillations per second are required in transmitting the human voice and the telegraphic apparatus cannot be used in this method of communication. The fundamental difference between the two systems from an electrical point of view is that in telegraphy use is made of low frequency interrupted electrical currents of a periodicity not to exceed six per second while in telephony there is a range of from two hundred to two thousand per second of an alternating or undulatory character. This difference necessitates a wide difference in plant facilities, their use and operation. In telegraphy messages are sent by code and the sender and receiver of the message over the wire must be a trained operator, and therefore it is impracticable to make it a distribution wire system reaching into the homes and business places of its patrons. The message in the first instance must be reduced to writing and taken or sent to the central office where an expert operator changes it into a code and forwards it to another expert who decodes the message and then delivers it to the one for whom it is intended. In telephony the services of an expert operator are not required to enable the sender to personally transmit his message to the one receiving it, and while the telegraph speaks but one language, without emphasis or modification of tone, the telephone speaks all languages, records the voice of the sender of the message and the exact emphasis placed by him on the language used. Its wires extend from the ex-

change to the subscriber's premises, and by these several extensions he can talk with all subscribers in his own vicinity and by connection with the trunk wires to distant places. In a telegraph plant there is little, if any, local wire distribution, while in a telephone system it comprises a large part of the plant, and in reaching its various patrons in a city or town imposes on practically every street its conduits, cables, poles and wires to an extent beyond reasonable comparison with that required by a telegraph service. In other words the telegraph has been developed as a trunk line plant and the telephone as a system of local exchange distribution in an effort to reach each home and place of business. It is apparent that there is a fundamental physical difference between the two systems as constructed and operated, and it is equally apparent that there is a fundamental difference in the use made of them as affecting competitive conditions. The Constitution of the Commonwealth recognizes that the accommodation and convenience of the public may be promoted by the maintenance of competing telegraph lines, whereas it is evident that the reverse is generally true as to the maintenance of competing telephone lines as aptly illustrated in the present case. With these two competing telephone companies, serving a limited territory, subscribers can only communicate with each other when they have the 'phone of the same company. To secure communication with all the patrons of the two companies it is necessary to take and pay for two phones, and this burden as well as the burden of paying for the increased expense of maintaining and operating two competing companies to obtain adequate telephone service is imposed on the public without any compensating return or advantage whatsoever.

In the opinion of the commission there is a real and substantial difference in the construction, operation and use between these two systems of communication to support the Act of July 22, 1919, as a proper and reasonable classification enactment, but if we had any doubt as to

its constitutionality we would in a proper case give effect to the act and leave that question for decision by the courts where it is properly lodged. In accordance with the foregoing report and determination an order will be entered approving the agreement of purchase of the property, rights, privileges and franchises of the Merchants and Farmers Telephone Company by the Cochranton Telephone Company, and the issuing of a certificate of public convenience accordingly.

### ORDER.

This matter being before the Public Service Commission of the Commonwealth of Pennsylvania upon petition and protest on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been had, and the commission having, on the date hereof, made and filed of record a report containing its findings of fact and conclusions thereon, which said report is hereby approved and made part hereof:

Now, to wit: April 13, 1920, it is ordered: That a certificate of public convenience shall issue, evidencing the commission's approval of the acquisition by the Cochranton Telephone Company of the property, rights, franchises, etc., of the Merchants and Farmers Telephone Company, in accordance with the terms and conditions of the sale, as set forth in paragraph five of the petition filed in this proceeding.

*Error assigned* was the order of the commission.

*John J. Northam,* for appellant.

*Frank J. Thomas,* of *Thomas & Thomas,* for appellee.

OPINION BY KELLER, J., July 14, 1920:

When our present State Constitution was adopted, the telephone had not been invented. Several years

passed after its invention before its possibilities in commercial and home use were at all recognized. When it was desired to create corporate organizations in Pennsylvania to take advantage of these possibilities, it was found that there was no law which permitted the incorporation of telephone companies and the only way then open by which the benefits resulting from the new invention could be widely enjoyed by the public was to make use of the likeness existing between certain parts of the physical apparatus—poles and wires—common to both systems and incorporate the new companies as telegraph companies, and so this was done and many telegraph companies were chartered whose only purpose was to carry on the telephone and not the telegraph business. It followed as a necessary result that corporations chartered, (and thereby securing the right to exist), as telegraph companies, were subject, no matter what their actual operations, to the disabilities attached to telegraph companies and as the Constitution expressly forbade the purchase or acquiring of a telegraph company by a competing company (article XVI, section 12), the same disability attached to companies furnishing telephone service that had no legal existence except as telegraph companies. Hence when application was made by these same companies, then existing as telegraph companies though devoted solely to telephone operations, to the Public Service Commission for approval of their merger, the commission although finding "that the merger and consolidation of these competing companies would be for the service, safety, accommodation and convenience of the public, if it were not contrary to law," felt constrained to refuse the application because of the constitutional inhibition against the merger of competing telegraph companies, and its action was affirmed by this court, (70 Pa. Superior Ct. 212), and the Supreme Court (263 Pa. 506).

Since that decision the legislature has by the Act of July 22, 1919, P. L. 1123, supplemented the general cor-

poration act so as to authorize the formation and creation of telephone companies and has provided therein for the acceptance of its provisions by corporations theretofore incorporated under the laws of the Commonwealth and engaged in the business of furnishing telephone service.  By its terms, authority is given to competing telephone companies created under said act, or having accepted its provisions, to merge and consolidate subject to the approval of the Public Service Commission.  The present application is in pursuance of said act.

By the Act of 1919, telegraph companies theretofore incorporated but carrying on the telephone business may do either one of two things.  They may elect to continue to enjoy the rights and remain subject to the disabilities attaching to them as telegraph companies, and they are, in that event, not affected by the passage of the act; or they may formally accept the Act of 1919 by following the course therein prescribed, as these companies did, and become telephone companies, thereby losing, by necessary inference, the rights, privileges and immunities previously enjoyed by them as telegraph companies, as well as the disabilities which were inseparably annexed to them as such.

The report of the Public Service Commission, which will be printed with the report of this case, justifies the action of that body in the premises and is convincing as to the desirability, as well as the validity, of the legislation invoked by this application.  There is no reason why the legislature should not do now what it might legally have done when the telephone was first invented, nor, why it may not, by general statute, provide that a corporation may, by complying with certain prescribed formalities, divest itself of certain powers and privileges and assume others in their place and stead: Tyrone Gas & Water Co. v. Tyrone, 195 Pa. 566.

The commission has found that the merger of the applicant companies is necessary to their continued ex-

istence and will result in a greatly improved service, inuring to the accommodation and convenience of the public. The expert testimony produced at the hearing demonstrates the essential differences now existing between telegraph and telephone companies. They are summarized by Mr. Grace, an engineer of twenty years' experience, as follows: "1st. The two systems are electrically different in that one uses a very low frequency and the other a relatively high frequency electrical current. 2d. One system requires the use of trained operators to place and receive messages in code, whereas the other provides a direct means of personal conversation. 3d. Because of the difference as shown in (2), the telegraph system has developed only as a trunk-line plant connecting cities. On the other hand the telephone has developed most largely as a system of local exchange service, with a distribution wire network ramifying through all the streets and reaching every house and place of business." The differences with regard to the policy of competition were also clearly set forth by this witness: "Telegraphic systems consist almost entirely of trunk lines connecting cities and the extent of their local wire distribution within cities is very limited. Generally speaking, the telegraph company will establish one or at the most a relatively small number of central transmitting offices and their customers must take their telegrams there for transmittal. Potentially, every one has the use of the telegraph companies' facilities. In order, however, that any individual may send a telegram it is necessary to take or send his message either to the central transmitting station or to some one of the branch offices. If there is enough business between two cities to warrant two competing telegraph trunk-line plants with associated terminal offices, the economic loss in such a case may not be of a high order. Railroad competition between adjacent cities can be cited as being frequently in this class......A telephone company, in furnishing an adequate personal intercommunication

service must have direct wires reaching each individual subscriber in his home or business place. So great in extent has become this network of local lines that to-day approximately 80 to 85 per cent of the telephone companies' investment is represented by exchange plants and only the small balance of 15 to 20 per cent is in trunk-line plants, analogous to the trunk-line plants of the telegraph company......If a second telephone company is to furnish competition, it must have its own wires on every street and be in a position to furnish service to every subscriber on short notice. This means a duplication in all city streets, of the intricate network of conduits, cables, poles and wires that are necessary for telephonic intercommunication. Moreover, competition in telephony means that every common patron must have two sets of instruments available for his use subjecting him to very considerable inconvenience regardless of the economic loss involved......To sum up it may be said: 1st. While competition between telegraph companies can be tolerated in some instances without serious economic waste, in the case of competitive telephone companies economic waste is inevitable because of the tremendous loss entailed by the duplication of the distribution system. 2d. Because one is chiefly a trunk-line system and the other chiefly a distribution system the duplication of one results in no inconvenience to the patron, while the duplication of the other produces the serious inconvenience of two telephones upon every common patron. 3d. Because of their distribution plants, competitive telephone systems impose an encumbrance upon highways very much greater than that imposed by competitive telegraph systems."

These excerpts are sufficient, in our opinion, to show a fair basis for distinction and classification between telegraph and telephone companies, a natural differentiation which the legislature was justified in recognizing.

This court has already sustained such differentiation in legislation on this subject. In Consolidated Telephone Co. v. Public Service Commission, 73 Pa. Superior Ct. 110, this court upheld the differences between telegraph and telephone companies contained in the Public Service Company Law relative to the connection of lines, (see article II, section 1, clauses U. and V. respectively; and article V, sections 8 and 9, respectively), and refused to require a connection between the lines of two telephone companies, notwithstanding the provisions of article XVI, section 12, of the Constitution granting such right, thereby holding that the legislative distinction between the two kinds of companies was such a reasonable regulation as was contemplated by the Constitution, even though at the time both companies were organized as telegraph companies.

The inherent differences between telegraph and telephone companies are at least as great as, if not greater than those between railroads and street railways,—as railroads adopt electricity as motive power and street railways occupy private rights of way and haul freight and express, the differences are becoming even less,— yet it has been held that the provisions of the Constitution prohibiting consolidation of parallel or competing lines of railroads (article XVII, section 4), should not be extended so as to include street railways: Gyger v. Phila., etc., Ry. Co., 136 Pa. 96. We think a similar construction should be employed here, and that the prohibitions of the Constitution relative to telegraph companies should not be extended to a new class of corporations not in contemplation when the Constitution was adopted and inherently differing in vital respects from telegraph companies, when the rights of the public are sufficiently guarded by the provisions of the Public Service Company Law.

The order of the Public Service Commission is affirmed at the costs of the appellant.